Whenever you're ready. Good morning, your honors. John Mueller for the Chesapeake Bay Foundation. Sorry. It is our position that the district court abused its discretion by denying the Chesapeake Bay Foundation the right to intervene in a civil action concerning an administrative order that was issued by the Environmental Protection Agency. The Chesapeake Bay Foundation is a regional nonprofit citizens organization whose primary mission is to save the Bay through working to restore rivers and streams throughout the 64,000 square mile Chesapeake Bay watershed. The Bay Foundation has been involved in this work for over four decades through advocacy, education, and restoration programs. One aspect of our work is restoring local waterways that have been harmed by polluted farm runoff. We do this by lobbying for funds like through the Farm Bill that are set aside for restoration initiatives on farms. We seek grants from organizations that provide for the installation of best management practices on farms like planting buffers alongside streams, fencing cattle and livestock out of the streams. We also provide technical advice to farmers on how to install best management practices and what are the best practices to put on their farms. We also provide membership manpower. Many of our members participate in these activities, planting trees and helping farmers restore their property and restore their local watersheds. We also work to ensure the government does its job to enforce the Clean Water Act. And with respect to farming, EPA's primary enforcement tool is the Concentrated Animal Feeding Operation program that is part of the Clean Water Act and point source permitting through the National Pollution Discharge Elimination System. And that system only addresses farms that actually discharge pollutants into local waterways. The Chesapeake Bay Foundation sought to intervene in this matter because we believe that the court was on the verge of issuing a ruling that would have far-reaching implications with respect to EPA's authority to administer that CAFO, Concentrated Animal Feeding Operation program. Well, now, that obviously can't be the reason for it being untimely in that you felt like he was about to rule adverse to your interests. My concern is, what reason did you give the district judge for the timing of your filing to intervene? In fact, Your Honor, we have been keeping an eye on the case because we understood that there were some novel issues with respect to the kind of discharge from this farm. We thought that the government had it under control. The government actually withdrew its unilateral order to the farm owner, Ms. Ault, and then moved to dismiss the case. And so we believe that the right decision there was for the district court to, in fact, dismiss the case, and then there would be no issue and no reason for us to get involved. But when we read the court's decision on the motion to dismiss, we recognized that Judge Bailey was actually looking at a much broader issue, which is to address, as he put it, typical rainwater flowing off of farms, and that he wanted to write an opinion that was addressed for thousands of farms, not just this one farm in particular. And it was at that juncture that we realized that this case was going off the rails from our point of view. Plus, another thing that happened, the Bay Foundation had actually sued the Environmental Protection Agency back in 2009, and we were able to settle... Did you tell Judge Bailey that when you filed your motion to intervene and were offering an explanation for why it was timely, that that was the reason you were trying to get into the case? That the motion to dismiss had been denied. Yes, sir, we did do that. And we also raised the fact with the court that we had sued EPA and had a settlement agreement with EPA, and that settlement agreement had been recently modified. He issued his opinion in April. In May, we had to modify that settlement agreement with EPA that addressed the CAFO program specifically. And EPA Region 3 was, in fact, supposed to go out and review farms and determine whether any of these farms were actually discharging under the CAFO program. And one of their aspects of the settlement agreement was to then issue similar unilateral orders to those farmers saying, you need to get a discharge permit. So you're watching the case, everything's going satisfactorily, so to speak, not completely, but then you see it take a turn for the worse, and then you want to intervene to protect your interests. Yes, Your Honor. And, you know, I think one of the things that's important about the timeliness issue, and this case had great significance to CBF simply because we do work with farmers, and we wanted to maintain that working relationship. In fact, I went up to the Shenandoah Valley and interviewed several farmers that we had worked with. I'd called farmers in West Virginia about their point of view. We actually had a full meeting of our board, which is much different than the typical way we litigate matters. We usually refer to a small subcommittee of board members and decide whether to go forward with litigation. But the decision to get involved in this case was a unique one for us, it was novel for us, and we had to do it the best way we could to look at all the different aspects of that case and what the possible pitfalls were going forward. And after that review, we filed our motion to intervene. It was a day after the motion for summary judgment was filed by the plaintiffs. The plaintiffs actually had an opportunity to respond to our motion to intervene. And then on July 30th, Judge Bailey denied our motion to intervene. We had to act quickly because we were prepared to file our motion for summary judgment, our cross-motion for summary judgment on August 1st. And so within two days, we converted that brief into an amicus brief, filed a motion with the court, asking it to consider our point of view, which goes beyond the information that had been provided by the Environmental Protection Agency and the other defendant intervenors. Because of our work... But letting you intervene, wouldn't that have disrupted the briefing order or the briefing schedule the district judge had set? I mean, the plaintiffs have already filed their motion, I guess, for summary judgment or a motion to dismiss. For summary judgment. Letting you intervene means that process has got to start all over again. No. Otherwise, the plaintiffs don't have an opportunity to respond to any additional issues you're going to add to the case. That's not correct, Your Honor, because the way the briefing schedule was set out is that the government was then, and the other defendant intervenors that were already in the case were going to file their responsive pleadings and cross-motions a month later on August 1st. We were prepared to do that. We, in fact, wrote in our motion to intervene, we recognize there's some issues here with respect to how many pages the plaintiffs are going to have to respond to, so we offered to cut our brief almost in half to go from 40 pages to 25 pages. Judge Bailey looked at that and basically said, well, it's a great effort, but it's a little too late. And it ruled, essentially, that... You don't think it would have affected how the plaintiffs drew their brief up? Not to know that there are going to be other parties involved with possibly different arguments that they have to anticipate? Well, they did know that the government was going to file a brief, and they knew that other defendant intervenors were going to file a brief. Right. And they would get the opportunity to respond. But obviously you didn't feel your interests were completely represented by those parties that there were other issues unique to you that you wanted to introduce into the case that the plaintiffs, at that point, were not aware of. Well, they would have been aware of when we filed our brief, and they had the right to file a reply. When they filed their brief. They were not aware of it when they filed their brief. Right. A lot of us are trial lawyers here, and we all know that we can't really anticipate what the other side's going to say in defense until we get their brief. And that was exactly our point here. Well, this case has been going on for a long time. I suspect there have been a lot of discussions and a lot of familiarity with what everybody's position was. Well, actually, this is a rather unique case in the sense that this is an Administrative Procedure Act case, and there was no discovery here. So what the court was looking at, and all the parties were looking at, was the record submitted by EPA as far as the administrative record. That was the basis of the decision, and that was what was being called into question. We actually wanted to add to that record by putting in a declaration from a fellow who had worked for the National Resource Conservation Service, an arm of the Department of Agriculture, who'd worked with farmers for over two decades, installing best management practices on farms and instructing farmers like Mrs. Ault on how they could prevent runoff from their farm. So you want to add to the administrative record? Not so much add to the record, but be able to put our view of the fact. And we did want to bring in, yes, additional photographic evidence, because one of the things that was critical... Did you file affidavits and photographs? We did file that as part of our amicus brief, yes, sir. And so we had the affidavit from Mr. White Scarver, and then we found other documents from EPA... Did you file the amicus brief after you were denied the right to intervene? Yes, sir. Did the judge ride primarily, if it's fair to say, on the timeliness in denying your right to intervene? That was the sole issue he looked at, because he said that our filing foreclosed their ability to respond, and that's simply not correct. He said timeliness and prejudice. Well, he equated the two. Right, but he said it was untimely. He said it was untimely and that... You've got to convince us that that was an abuse of his discretion. Right. And how do you do that? I mean, obviously, any one of the three of us might have ruled differently from this district judge, but how do you get to an abuse of discretion under these circumstances? You do agree that's the standard, as Judge King said? Yes. Well, actually, there are three factors to look at with respect to timeliness, and one of those is prejudice. They're not prejudiced because they had the right to respond to our brief, so maybe we added some new issues, but they had the ability to respond. In fact, the court allowed the plaintiffs to file a surreplied brief after the government's and the defendant's intervenors filed their cross motions for summary judgment because they said there were new issues in the case. So it was not like Judge Bailey didn't have any ability to make any burden less on the other party, on the plaintiffs, and in fact  But how do we equate the judge's failure to do that to an abuse of discretion? Because he made an incorrect factual decision. He said that the plaintiffs had no ability to respond to our arguments. That may have been a slight overstatement, but again, I'm really interested in this. What are we saying to district judges if we come along behind them? I mean, this is pretty routine, right? And most of the times it's granted, and that's the point. And even when it's denied, it's rarely appealed. Right? Right. And you're an amicus. Well, no, we're not. He denied our amicus motion. So we don't have an amicus capability. He denied the amicus. And that's the problem. We don't have our issues being brought forward. Our issues are not being protected by the government. They're not being protected by the other defendant intervenors. And that's the sole problem here. And to get to your point about... The merits are coming up to us. Have you sought intervention in that case? No, the case held that decision, or that case in abeyance until it ruled on our motion to intervene. And so one of the things we've been trying to figure out here is, you know, is there a mechanical way in which we can avoid going back to Judge Bailey, having him review our materials, and then come back to the court again? You could file an amicus with us, right? In the other appeal. We could, but I know that the court's view on amicus, and we have new information that we would like to submit to the court about why the judge's decision goes way beyond focusing just on this one farm. And the photographic record that we intend to put into evidence, and the declaration of Mr. Weisgarber, established that fact, where we have photographs of chicken clean-out  mounds of manure right beside a creek, and it's discharging into that creek. And we've been denied the right to show if you say that all agricultural stormwater, that means any rain that washes off a farm, is exempt from the Clean Water Act, then all of those farms that are clearly in violation of the law, get off scot-free. And that completely undercuts our ability to restore the waters within the Chesapeake Bay region. And so to answer your question about, you know, where's the abuse of discretion? The abuse of discretion is in the fact that he found that they didn't have ability to respond to our arguments, when in fact they did. They had the chance to respond to our motion to intervene, which they did, and they also had the ability to respond in the reply brief when we filed our motion on August 1st. So, one of the ways we thought the court might get around this problem, was sending it back to Judge Bailey and then coming back again, restarting the appeal process, is that for the court to allow us to intervene here, but also allow us to put our evidence into the record, make that be part of the record. So you want to file a motion to intervene and then a motion to supplement the record? Correct. One of the things I don't understand is, I'm presuming you're keeping up with the case, that you know what the briefing schedule is, you see when the plaintiff's brief is due, you want to intervene, why don't you go in and ask the court then, before the briefs are filed and commitments are made and to suspend the briefing schedule. Say, look, we want in this case, it's going to affect what they do, we don't want to wait. What you did is, you waited, well, I'm not saying you did this intentionally, but what the result was, you got to see the plaintiff's brief, see what it said and then you file and want to get in the case when you really want to get into it as a full party and give everybody a fair shot, it seems to me you would have made that motion before briefs were filed. Respectfully, I disagree, Your Honor, because you know, the briefing schedule was set, and so the one party files their brief, the plaintiff's file theirs. But you can go in and ask the court to amend the briefing schedule. Well, they had already amended it several times and the court said, recognize we've amended it several times but we're going to go forward on the schedule that we have. We felt we were prepared to meet that schedule, which is the same day the government's brief was due, we were ready to file our brief. So there was really nothing for us to ask the court to do, we were going to be on time. Thank you, Mr. Mueller. Let's hear from Mr. Banks, you have some time remaining. Thank you. Please, the court. Good morning, Your Honors, the questioning and discussion so far has turned primarily on the timeliness issue, naturally because Judge Bailey based his decision on that. And I will get to those questions and issues in just a moment, but I wanted to point out at the outset that the outcome of this appeal really is controlled by a decision this court issued last year on adequacy of representation. It was the Stewart v. Huff case and in that case the court decided that for the first time, that it would join other circuits in announcing the following rule, that where an intervener, a proposed intervener shares the ultimate objective in a case with a government agency, there is a strong presumption that that government agency represents that proposed intervener's interests, which can be overcome only by a strong showing of adversity of interest or nonfeasance by the government or collusion. I don't think either of the latter two are being argued. Are you comfortable with the reasons the district judge gave for denying the motion? We're quite comfortable, Your Honor. But you're not arguing any reason he gave? I certainly intend to turn to that, and I can now. You cite that case in your brief? Yes, we do. What's the name of it? Stewart v. Huff? And I would point out that the appellants made no discussion of that case in reply. But I will turn to the reasons offered by CBF for their tardiness in this case, which are factors to be considered, and also the prejudice that resulted to the other parties from their untimely effort to intervene. There were nine parties in this case. None of those nine parties supported CBF's untimely effort to intervene in this case. We were on the eve of we were actually into summary judgment briefing. We were 13 months after the filing of the complaint in the case. We were four months after CBF concedes that it knew about the case. We were two and a half months after the district court denied EPA's motion to dismiss the case, and CBF says that it at that point realized what was at stake. Two and a half months were awaited until the motion to intervene was filed one day after the plaintiffs filed our motion for summary judgment. Now the reasons they give focus primarily on this side agreement that they had with EPA, and they felt that this side agreement could be undercut by a decision this district judge might make on the merits of the case. First of all, the district court did not say that it intended to expand this case to cover all manner of farms in the Chesapeake watershed or elsewhere. What it said, and should have said, is that it intended to decide the single legal issue in the case, which was a question of statutory interpretation, and that its decision on that could affect all farms. Well, of course it could. And it had on the record before it not the farms that CBF would like to have placed into the record, not the photographs and the evidence about poor farming practice. It had Lois Ault's farm. And the sole issues were whether the dust that blows out of ventilation fans at a poultry farm or little particles of manure that are occasionally tracked out on the ground when machinery runs in and out, or feathers or dander from the chickens that blows out onto the ground, whether that should be regulated under the Federal Clean Water Act when it rains and washes that dust and those little particles off across a pasture and into a creek. That was the legal question. The Clean Water Act says that agricultural stormwater is not controllable by EPA with a permit under this statute. And he intended to decide that question. And if he did this administrative record, that was agricultural stormwater runoff and exempt from regulation, it would affect other farms where good housekeeping practices are carried out and where manure piles are not placed next to streams and where the statute evidences Congress's intent to not saddle farmers who are doing a good job of managing their farms with Federal regulation. That was the issue. And yes, it could affect a lot of farms, the ones that are doing it the way Lois Holt manages her farm. So what do they offer? They have this agreement, this side agreement with EPA, and they say in their brief that this side agreement included four things. First, EPA promised to assess state regulatory programs, I assume the ones in the Chesapeake watershed, for whether they're adequate to control CAFOs. EPA can assess state programs whether or not the district court decides this one legal issue. Those programs have to do with a lot of things, including the land application of manure to grow crops, which Mrs. Holt does not even do. Second, EPA promised to designate more CAFOs. There's a provision of the regulations allowing EPA to come along and designate a farm as a CAFO if it chooses to. But Lois Holt already operates a CAFO. We already know it's a CAFO. It's one of the larger CAFOs. So that wasn't an issue. And EPA's ability to designate others as CAFOs wasn't an issue in this case. Third, EPA promised to review existing permits for CAFOs and assure that they were adequate. Well, Lois Holt doesn't have a permit, doesn't need a permit, and so EPA's ability to review permits at other farms has nothing to do with how this district court would rule on the merits in this case. And finally, EPA decided, as it has many times, to review the overall situation with agriculture in the Chesapeake and decide whether more regulation would be necessary. EPA always has that authority, but it made a promise to CBF to do that, I presume by a time certain. So these are the weak rationalizations offered by CBF to suddenly have an interest in this case because the district court decided it was going to decide the legal issue. The only legal issue in the case, the reason the case was brought, and the issue that the plaintiffs presented to the district court in a motion for summary judgment, and ultimately it was decided in that way. Now, what was the prejudice of this tardy attempt to intervene? First of all, as Chief Judge Traxler pointed out, we were not able to anticipate all of the litany of evidence and expert opinion and arguments that the Chesapeake Bay Foundation would bring into this case if it were allowed to intervene. We didn't know they wanted to intervene. But in our motion for summary judgment, we certainly would have anticipated, had we known, and we would have made strong arguments that this was a case limited to the administrative record compiled by EPA to support its decision that was being challenged in the case, and that all the rest of these so-called facts and expert opinions about farms and about the watershed should not be allowed in the case. And we would have made that in our opening brief in support of summary judgment. In addition to that, here we are with five environmental organizations and the United States of America against us, and we're anticipating after we file our motion for summary judgment, there will be two large motions for summary judgment from those existing parties, as well as responses to our motion for summary judgment. If CBF is allowed in the case, now it's not going to be two motions and two responses. It's going to be three of each. And we can tell from what CBF later filed as an amicus brief, it was going to be massive and far-flung, hundreds of pages of material. And so we were going to need an extension. The amicus submission wasn't filed, though, they said. It was filed, and Judge Bailey looked at it and said I'm not going to allow this to be accepted into the case. He rejected it, and he said the reason he rejected it is that it didn't tell him anything new. They made the same legal arguments that EPA made. They had the same interests. But they were going to add things that weren't in the administrative record? Exactly. Is that order in the joint appendix here? I believe it is. The denial of the effort to get an amicus brief filed. I believe it's in the joint appendix. So 30 days to respond to three motions for summary judgment, and to reply to three responses to our motion for summary judgment would not have been adequate. We would have sought additional time. In addition, because this effort to go way beyond the administrative record was problematic for us, we would have filed a motion to strike all of this material had CBF been allowed into the case at this late date, and that would have required not only further effort, but further time to allow briefing on whether this material should be allowed in the case before we could get back to summary judgment briefing. And so, yes, we were prejudiced. The case was going to slow down. Judge Bailey recognized that. The case was nearly at its end, and it was going to be reduced to a crawl while he had to tackle these side issues, these tactical attempts by CBF to expand the record without any justification, get that back on track, and then produce a longer briefing schedule for summary judgment so that we could actually get a decision on a single legal issue in the case. So those are the ways we were prejudiced. Those were the reasons that CBF offered for waiting so long. I mean, they still not have answered your question as to why it took two and a half months after the motion to dismiss was denied for them to hold their board meeting and decide this case was important enough to get involved. Two and a half months. And had they gotten involved shortly after the motion to dismiss was denied, then we could have worked out a briefing schedule. Then we could have considered whether in an orderly fashion, whether there should be additional material in this case. If there are not further questions about timeliness, I would turn back just briefly, if I may, to the Stewart case. In that case, it was a challenge to an abortion statute. And the Attorney General of Virginia was the defendant supporting that statute, trying to sustain that statute.  come into the case to support the state on their side of the case. And this court said that there is a strong presumption that a government agency represents the interests of those with whom it shares the ultimate objective in the case. The ultimate objective in that case was sustaining a statute. And parties conceded that they shared that ultimate objective. Of course, the ultimate objective in this case is that EPA's order that we challenged would be upheld and not set aside under the Administrative Procedures Act. It was as simple as that. The government's objective, EPA's objective, was the same as CBS, to have our motion for summary judgment denied. Pure and simple. This was a yes-no case. This was either we win or EPA wins, and they wanted EPA to win. So when you have this strong presumption that a government agency represents your interests, the showing that must be made is that there are some adversity of interest between the proposed intervener and the government agency. Well, CBF shows nothing here. They make no attempt to show any adversity of interest. They share the same objective. They merely say that there was no guarantee that EPA would make all the same legal arguments they would make. Well, we know that's not true, because CBF later submitted its legal arguments in the form of a proposed amicus brief, and they were the same legal arguments. The same arguments that EPA had already made. They say that EPA is limiting its defense of its order to legal argument, whereas these interveners, CBF, want to put facts in the administrative record. Well, that was precisely the distinction that this court found wanting in the Stewart case. Those proposed interveners wanted to put facts into the record, into the case, whereas the Attorney General of Virginia wanted to argue the law, and only the law. And this court found that that was not an adversity of interest. It was merely litigation tactics. And differences of litigation tactics, as you had in that case, and we have in this case, are not sufficient to show adversity of interest. And finally, I gather that CBF argues that EPA might shift its position. It's taking a position in the case and has throughout the district court proceedings, but might take a different position here, might take a different position if the case were to get back before the district court in some way, but that's mere speculation. It's certainly not adversity to speculate that EPA might take a different position than the one it has already taken that comports exactly with CBF's position in the case. There is not a glimmer of daylight between CBF and EPA in terms of their position on the legal issue decided in this case. That's not even a distinguishable legal position, let alone an adversity in terms of their interest and their stance in the litigation. So we think Stewart controls this case, but we also believe that there is, that the record absolutely supports Judge Bailey's exercise of his discretion in attempt to intervene was untimely, would have prejudiced the existing parties, and would have slowed and disrupted the litigation he had in front of him. Mr. Banks, what would be the practical effect of a reversal here? If the reversal is on the timeliness question, we think... Or generally just an abuse of discretion. Without deciding the intervention motion? Without deciding the intervention motion. Yes. Well, there would be a remand for Judge Bailey to consider the intervention motion anew, but we've found no case that would support the notion that the judgment below on the merits would be disrupted at all. And the case is no longer before judgment? That's correct. It's on appeal here. So what would happen if it went back? Well, that presents a real dilemma for CBF, because if their issue of intervention were before the court, but the merits were not, let's assume that Judge Bailey might be able to decide the intervention motion, allow them into the case. Now they want to participate in the appeal, but they did not file a protective notice of appeal. So there they are. They might try a 60B motion to seek relief from the judgment on the merits, but that jurisdiction's not in front of the district court. So I think they're out of luck. They certainly could not now file an appeal because time has passed and the deadline has passed, and that's jurisdictional. You're saying this appeal's moot? This appeal then is moot because nothing can be done if it goes back? There certainly have been cases that decided exactly that. Because there is no meaningful relief that the appellant can be given, this court lacks jurisdiction to decide. They could seek to be amicus here. Yes, they could. Yes, they could. And we would hope this court would, when the time comes, be very circumspect about how much evidence of other farms gets into the case. I like the way you put that. Further questions, Judge Davis? No, thank you. Thank you, Mr. Banks. We'll hear from Mr. Mueller and reply. Thank you. Judge Davis, to answer your question, yes, the denial of the amicus was in the record, and it's J.A. 242. Okay, thanks. One of the other points that Mr. Banks makes is that nobody supported our intervention. Well, in fact, the government never does. The government always takes no position, so that's not unusual. They take no position? They didn't object to your intervention? Yes, sir. How about on the amicus papers? Did they object to that? They took no position. And as far as the other defendant intervenors, they basically said, we're worried that you're going to make us file a joint brief, and we recognize that we have different issues than CBF does, and we don't want to waste our paper, or their space, covering a CBF issue. So they didn't object to us participating, but they just didn't want to file a joint brief. Now, with respect to these questions about the adequacy of representation, I have to take issue with Mr. Banks' arguments. First, we went to great pains, in fact, to make certain that our brief did not overlap what the government wrote. We're, in fact, involved with litigation with the Farm Bureau that's on appeal to the Third Circuit that involves the Chesapeake Bay total maximum daily load, and their appeal of that decision of EPA to issue that total maximum daily load. And before Judge Rambo in the Middle District of Pennsylvania, she said that the government was not representing our interests, and we raised the exact same claims here. That the Fowler Settlement Agreement against EPA brought our issues to a different level. That, in fact, the government may change its position midstream. The fact that the court is not aware of is that it took us 30 years to get where we are today. That we had to file a suit against EPA to get them to actually issue a total maximum daily load, to take action with respect to concentrated animal feeding operations, to look at stormwater runoff, and to actually take that action. And so to suggest that our interests are the same is just patently false. So with that, Your Honor, I do believe that there are some issues or some ability for the court to create a remedy here that would allow us to get our evidence into the record and to participate on intervention. We can go back before Judge Bailey, or the court can figure out a way to get us involved here. So thank you, Your Honor. Thank you, Mr. Mueller. I will come down and greet counsel, then take a short break.
judges: William B. Traxler, Jr., Robert B. King, Andre M. Davis